Filed 6/17/14  In re K.C. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

In re K.C. et al., Persons Coming Under the Juvenile Court Law.

| | |
|---|---|
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E059781 |
| Plaintiff and Respondent, | (Super.Ct.No. INJ1100465) |
| v. | OPINION |
| B.C., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Lawrence P. Best, Judge.  Affirmed.

Linda Rehm, under appointment by the Court of Appeal, for Defendant and Appellant.

Pamela J. Walls, County Counsel, and Sophia H. Choi, Deputy County Counsel, for Plaintiff and Respondent.

1

Appellant B.C. (mother) appeals from the juvenile court's denial of her Welfare and Institutions Code[1] section 388 petition regarding her children, A.O. and K.C. She also claims that the beneficial parental relationship exception applied. (§ 366.26, subd. (c)(1)(B)(i).) We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On August 11, 2011, the Riverside County Department of Public Social Services (the department) filed a section 300 petition on behalf of mother's children, E.C., R.C., N.H., and A.O. (the children). At the time, E.C. was 13 years old, R.C. was 11 years old, N.H. was 10 years old, and A.O. was seven months old.[2] All four children had different fathers. The petition alleged that the four children came within section 300, subdivisions (b) (failure to protect) and (g) (no provision for support).

The petition included the allegations that G.O., the father of A.O.[3], perpetrated severe acts of domestic violence on mother while in the presence of the children and had the propensity for violence, as evidenced by his arrests for vandalism (Pen. Code, § 594, subd. (b)(1)), corporal injury on a spouse (Pen. Code, § 273.5), and domestic battery (Pen. Code, § 243, subd. (e)(1)). The petition also alleged that mother had demonstrated a limited ability to protect herself and her children, since she minimized the domestic

---

[1] All further statutory references will be to the Welfare and Institutions Code, unless otherwise noted.

[2] E.C., R.C., and N.H. are not subjects of this appeal.

[3] G.O. is not a party to this appeal.

violence in the home and failed to obtain a restraining order against G.O. The petition further alleged that mother had a history of substance abuse.[4]

In the detention report, the social worker reported that mother's home was filthy, and that mother was a dancer at a club and would leave her children home alone with just her 13-year-old daughter. A second referral was received on July 21, 2011, alleging that mother was in a domestic dispute with G.O., at which time G.O. was arrested for battery. It was further reported that mother tried to cut her wrists.

A detention hearing was held on August 12, 2011, and the court found that a prima facie showing had been made that the children came within section 300. The court ordered the children detained as to their fathers, but allowed them to remain in mother's custody. The court granted a temporary restraining order against G.O. The court also ordered that any contact between him and the children had to be directed/approved by the department.

*Jurisdiction/disposition Report and Hearing*

The social worker filed a jurisdiction/disposition report on August 29, 2011, and recommended that the court sustain the petition and adjudge the children dependents of the court. The social worker further recommended that physical custody be removed from G.O. and that he be offered reunification services. The social worker recommended

---

[4] The allegations under section 300, subdivision (g), concern two of the fathers. These fathers are not parties to this appeal.

that mother retain physical custody of the children and be offered family maintenance services.

The social worker reported that mother continued to put herself and the children in danger by allowing G.O. back in the home, despite domestic violence problems. The social worker also noted that mother was uncooperative with the department, as she did not make herself or her children available to the department for interviews. When a social worker went to mother's residence to check on the welfare of the children, mother would not allow her in the home.

A contested jurisdiction/disposition hearing was held on October 24, 2011. The court struck the allegation that mother had a substance abuse problem, but sustained the petition as to the other allegations and adjudged the children dependents of the court. The court removed the children from the custody of their fathers, and ordered them maintained in mother's custody with family maintenance services. The court ordered G.O. to participate in reunification services. The court also granted a no negative contact restraining order against G.O. The restraining order stated that G.O. was only authorized to have supervised visitation with A.O. once a week for two hours.

*Section 387 Report and Hearing*

The social worker filed a section 387 supplemental petition on March 16, 2012, alleging that mother failed to cooperate with the department by allowing G.O. unauthorized contact with the children, thereby violating the restraining order. It further

4

alleged that mother's residence was observed to be filthy, thereby placing the children at risk of suffering from serious physical harm.

In the section 387 report, the social worker stated that on March 14, 2012, when a social services assistant arrived at mother's home to transport A.O. to a visit, she noticed G.O.'s truck in the driveway. Mother came out and said she was just borrowing the truck. She told the social services assistant to come inside while she cleaned up the baby before the visit. The social services assistant observed that the home was filthy. The social services assistant followed mother into the bedroom and immediately noticed a pair of G.O.'s shoes, with socks tucked into them. Mother denied he was in the home, but then said, "You are taking my kids[,] aren't you?"

The older children (E.C., R.C., and N.H.) were transported to the department's office where they were interviewed. Both E.C. and R.C. were wearing stained clothing, and they smelled like cigarette smoke. Their hair was not groomed. N.H. also had greasy hair, and he was wearing heavily stained clothes and he had pet hair on the back of his shirt.

The social worker was concerned that mother had been allowing G.O. in the home. In December 2011, G.O. called the social worker to ask about the restraining order. He said that mother was constantly calling him to come over to the home. He reported that he went there earlier that month; he and mother got into a physical altercation, and she scratched him.

At the hearing on the petition on March 20, 2012, the court found that the children came within section 387 and detained them in foster care.

*Section 387 Jurisdiction/disposition and Six-month Status Review*

The social worker filed a jurisdiction/disposition report on April 6, 2012, recommending that the court find the allegations in the section 387 petition true, and that mother be provided with reunification services. The social worker reported that she interviewed mother, who denied that she called G.O. She also denied that the shoes in the bedroom belonged to him; she said they were slippers that belonged to her son. Mother further explained she had just had an operation and, thus, could not clean the house. At the interview, mother was not wearing clean clothes and her hair was not groomed.

The social worker further reported that mother was unemployed. She was not in contact with any of her children's fathers. Mother specifically stated she was no longer in a relationship with G.O.

The social worker also filed a six-month status review report on April 11, 2012, recommending that the children remain dependents of the court, and that mother be granted reunification services.

A contested jurisdictional hearing on the section 387 petition was held on June 8, 2012. The court found the allegations in the petition true and found that the previous disposition had not been effective in the protection of the children. The court removed the children from mother's custody. The court ordered mother to participate in

reunification services. The case plan included the requirements that mother complete an approved domestic violence program and develop a relapse prevention plan, that she complete a parenting education program, that she obtain a substance abuse assessment and, if treatment was necessary, submit to drug testing and participate in a 12-step program and an outpatient program.

The court held a contested six-month status review hearing on the same day and found that mother had made minimal progress toward alleviating or mitigating the causes necessitating placement. The court granted sole physical custody and joint legal custody of N.H. to his father and terminated its jurisdiction as to him.

*Twelve-month Status Review Hearing*

The social worker filed a 12-month status review report on November 6, 2012, and recommended that reunification services be terminated and a Welfare and Institutions Code section 366.26 hearing be set as to A.O. The social worker reported that during the summer months, mother and G.O. were involved in two domestic violence incidents. G.O. was arrested on August 17, 2012 for battery on a spouse. (Pen. Code, § 243, subd. (e)(1).) He pled guilty.

The social worker further reported that mother did not have a cell phone and had not maintained consistent contact with the department. Despite the department informing her that she could call collect, she did not maintain contact. Moreover, mother went approximately six weeks without visitation. Then, she had weekly visits for approximately one month. However, she then did not have any visits from September 28,

2012 to the date of the report (November 6, 2012). The social worker concluded that mother had not benefitted from the services provided to her and had not made attempts to see her children. She further stated that mother was in no position to care for the children, and that she did not know mother's current whereabouts.

In an addendum report filed on December 28, 2012, the social worker reported that mother went to the Indio Child Protective Services office and wanted to know if she could visit the children. The social worker talked to her on the telephone and told her she had to drug test before the visit. Mother hung up the phone and left the building. She did not make contact with the social worker after that, and had still not visited the children since September 28, 2012. At a previous meeting with mother, the social worker expressed her concern that mother was continuing a relationship with G.O., despite the past domestic violence between them. Mother denied it. The social worker asked mother if she was able to provide for the children, and she said she would go to a shelter.

A contested 12-month status review hearing was held on January 4, 2013. Mother failed to appear, and her counsel did not know her whereabouts. The last time mother had contacted her counsel a few months prior to the hearing, she was living in a shelter. The court found that mother and G.O. had made minimal progress toward alleviating the causes necessitating placement. The court terminated their reunification services. The court set a section 366.26 hearing as to A.O. for May 1, 2013.[5] The court also ordered supervised visitation at least once a month for mother.

---

[5] The court ordered a Planned Permanent Living Arrangement for E.C. and R.C.

*Section 300 Petition as to K.C.*

On March 15, 2013, the department filed a section 300 petition on behalf of K.C., mother's fifth child, who was approximately three weeks old at that time. The petition alleged that K.C. came within section 300, subdivision (b) (failure to protect). It specifically alleged that mother and G.O. (K.C.'s alleged father) had a history of domestic violence, and that mother had demonstrated a limited ability to protect herself and K.C. from suffering physical harm by G.O. in that she had failed to abide by the current restraining order against G.O. The petition included the specific allegations that mother had an extensive history with the department, she had an unresolved history of substance abuse, she had a criminal history, and she was currently homeless and unable to provide K.C. with a stable living environment.

In the detention report, the social worker reported that mother was hospitalized for approximately one month due to pregnancy complications with K.C. K.C. was born premature, at 31 weeks and two days. Mother had no place to live after discharge from the hospital and was currently seeking a domestic violence shelter. Mother had tested positive for methamphetamine when she was pregnant, but still denied using methamphetamine. Mother reported to the hospital staff that G.O. was the father. However, when the social worker arrived at the hospital, mother would not tell her who the father was, stating that it was "none of [her] business." She denied having contact with G.O., due to the restraining order. Mother said she had no place to live, but the

9

hospital worker was helping her find a shelter. Mother reported that K.C. would be in the hospital for about one month, since she was premature.

The report stated that mother was discharged on February 28, 2013, and she entered an emergency shelter in Orange County. The shelter provided her with domestic violence education, substance abuse treatment, and counseling. She visited K.C. daily and provided breast milk for her. The social worker contacted G.O., and he said he did not know if K.C. was his child.

At the detention hearing on March 20, 2013, the court detained K.C. The court ordered visitation for mother to be "frequent and liberal."

*Section 366.26 as to A.O.*

The social worker filed a section 366.26 report with regard to A.O. on April 4, 2013, and recommended that she remain in her current placement with the permanent plan of adoption. The social worker reported that, since January, mother had only had two visits with A.O. At the first visit, mother did not, at any point, ask how A.O. was doing in her placement or ask about her development. A.O. did not call her "mommy." E.C. and R.C. were also at the visit, and mother spent more time talking to them than she did engaging with A.O.

The social worker reported that A.O. was continuing to bond with the prospective adoptive parents. She was placed with them on December 22, 2012, and appeared to have adjusted nicely to her new family. She seemed comfortable, secure, and attached to them. The prospective adoptive parents already had two adopted children, and they were

10

committed to providing A.O. with a loving, stable, and safe home.  They were capable of meeting her physical, emotional, social, and medical needs.  Their children were also excited for A.O. to become a permanent part of their family.  In a subsequent report, the social worker stated that A.O. had a stronger bond with the prospective adoptive parents than with mother, as she recognized them as "mommy" and "daddy."  The social worker opined that it was in A.O.'s best interest that parental rights be terminated, and that she be freed for adoption by the current caregivers.

*Jurisdiction/disposition as to K.C.*

On April 8, 2013, the social worker filed an amended section 300 petition to add K.C. to A.O.'s petition.  The allegation that mother was homeless was stricken.

The social worker also filed a jurisdiction/disposition report on April 9, 2013, recommending that K.C. be declared a dependent of the court, and that reunification services be denied to mother, pursuant to section 361.5, subdivision (b)(10).[6]  The social worker noted that mother was visiting K.C. daily at the hospital and was appropriate with her.

At a contested hearing on April 22, 2013, the court sustained the amended petition, adjudged K.C. a dependent of the court, and removed her from mother's custody.  The court denied reunification services and set a section 366.26 hearing for August 21, 2013.

---

[6] Section 361.5, subdivision (b)(10), provides that reunification services need not be provided to a parent when the court finds, by clear and convincing evidence, that the court ordered termination of reunification services for any siblings or half siblings because the parent failed to reunify with them after they had been removed.

11

*Section 388 Petitions*

On June 26, 2013, mother filed separate section 388 petitions with regard to K.C. and A.O.[7]  Both petitions requested the return of the children on family maintenance.  In the alternative, mother requested an additional period of reunification as to K.C.  As to changed circumstances on both petitions, mother alleged that she had completed a transitional living program, and anger management, parenting, domestic violence prevention, drug and alcohol, individual counseling, and personal empowerment programs.  She also alleged that she drug tested clean for 90 days, that she was attending Narcotics Anonymous (NA)/Alcoholics Anonymous (AA) meetings, and that she was now employed.  As to best interests, she alleged that she had visited A.O. and K.C., she loved them and was bonded with them, that her family heritage lives through them, and that they would do best in her care.

In an addendum report filed on July 12, 2013, the social worker responded to the section 388 petitions.  She stated that mother had not maintained consistent contact with A.O.  She did not visit with her from approximately June 13, 2012 to September 2012, and then from September 28, 2012 to January 30, 2012.  Furthermore, mother had not been able to maintain employment or provide evidence that she could provide for her children.  Mother was living in a sober living home, which was not an appropriate place for children and was not stable housing.  She continued to make excuses for her behavior

---

[7] We note that A.O.'s section 388 petition also included E.C. and R.C.  Since E.C. and R.C. are not subjects of this appeal, we will only refer to A.O. in our discussion of the petition.

and continued to deny any responsibility. She had failed to provide the social worker with any certificates of completion or drug test results. The social worker spoke with a case manager from the transitional living center where mother had previously lived, and she said that mother did not successfully complete a program to address domestic violence there. The social worker also stated that, throughout the past two years, mother continued to misrepresent her relationship with G.O., and there was no reason to believe she was not still involved with him.

*Section 366.26 as to K.C., and Combined Sections 388 and 366.26 Hearing*

The social worker filed a section 366.26 report with regard to K.C. on July 29, 2013. The social worker recommended that parental rights be terminated and K.C. be freed for adoption. Mother failed to address the issue of domestic violence, and mother and G.O. appeared to be in a relationship, despite the court-ordered restraining order. Mother continued to deny domestic violence issues between her and G.O.

In this report, the social worker responded to mother's section 388 petition for K.C. She stated that K.C. was five months old and had been placed in the same home since she was released from the hospital. K.C. was clearly bonded to the current caretaker, who had provided for her physical and emotional needs.

The court held a combined hearing pursuant to sections 388 and 366.26 on August 21, 2013, and continued it to September 6, 2013. Mother testified on her own behalf. She said that she moved to Women's Transitional Living Center (WTLC) on February 27, 2013. She said she participated in a 90-day domestic violence program there and,

13

after completing that program, no longer had contact with G.O. She said she was just trying to avoid "the whole situation." She said she also participated in a substance abuse program at WTLC, and then moved to the sober living home where she was currently residing. She would not be able to have her children live with her there, but said she could relocate to another home that would allow them. Mother further said she was working and trying to save money to get her own apartment. She believed she would able to financially support herself and her children, if the court returned them to her, since her mother planned to move in with her and help.

When asked why she thought it would be in her children's best interests to return them to her, mother replied, "I am changing my life."

The social worker also testified. She said mother did not keep her weekly visits with A.O. She said that, between March 2012 and January 2013, there was a three-month span, and then a six-week span, when mother did not visit. The social worker also said that A.O.'s caretakers had concerns when mother did visit with A.O. They reported that A.O. would say she did not want to go to the visits and she would cry during them. At the end of the visits, A.O. had no trauma leaving mother, and she would go right to the caregiver. The social worker said A.O. was affectionate with the caregiver and called her "mommy" and called the husband "daddy."

The court considered mother's petitions, as well as her testimony. The court concluded that, while the evidence did show some change of circumstances, it was clearly not in K.C.'s or A.O.'s best interests to grant the requests. The court accordingly

14

denied the section 388 petitions. The court further found that it was likely that both K.C. and A.O. would be adopted, terminated parental rights, and set adoption as the permanent plan.

ANALYSIS

I. The Court Properly Denied Mother's Section 388 Petitions

Mother argues that the juvenile court abused its discretion in denying her section 388 petitions with regard to A.O. and K.C. She argues that "[e]verything about [her] circumstances had changed," that she was no longer in a relationship with G.O., and that it was in A.O.'s and K.C.'s best interests to continue their relationships with her. We conclude that the court properly denied mother's petitions.

A. *The Court Did Not Abuse its Discretion*

A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new or changed circumstances exist, and (2) the proposed change would promote the best interest of the child. (*In re Stephanie M*. (1994) 7 Cal.4th 295, 316-317 (*Stephanie M*.).) A section 388 petition is addressed to the sound discretion of the juvenile court, and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion. (*Id*. at p. 318.) "After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interest of the child.

15

[Citation.] A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interest of the child." (*Id.* at p. 317.)

The juvenile court here did not abuse its discretion in denying mother's section 388 petitions, as she failed to show changed circumstances or that a changed order would be in the best interests of A.O. and K.C.

Mother requested that the court return A.O. to her on family maintenance. She requested the court to return K.C. on family maintenance, or in the alternative, grant an "additional" period of time for reunification services. We note that K.C. was adjudged a dependent of the court when she was only two months old. The court declined to provide reunification services to mother, pursuant to section 361.5, subdivision (b)(10), since reunification services had been terminated as to her other children.

Mother made the same allegations on both section 388 petitions. As to changed circumstances, mother alleged that she completed the 90-day WTLP "Step 1" and completed their anger management, parenting, domestic violence prevention, drugs and alcohol, and personal empowerment programs. She further alleged that she completed individual counseling and drug-tested for 90 days with negative results. Mother alleged that she subsequently began residing in Locust House, and that she was attending four NA/AA meetings per week and was drug testing negative. Finally, she alleged that she was now employed.

16

At the time the court terminated mother's services as to A.O. on January 4, 2013, the main issues were that mother did not have a stable home or employment, she had not visited A.O. in several months, and she was still having contact with G.O. Mother failed to even appear at the status review hearing when the court terminated her reunification services. By the time of the hearing on the section 388 petition, mother had lived at a transitional living center for three months, then recently moved to a sober living home. Mother testified that her children could not live with her at the sober living home, so she would have to relocate to another home that would allow them. She also said she was trying to save money to get her own apartment. Mother testified that she had a full-time telemarketing job but, as of the date of the hearing, she had only worked there a few weeks. Thus, mother still had no stable housing or employment. When asked if she was financially able to support herself and her children, she testified that her mother planned to move in with her to help her. In other words, mother would only be able to support them if her mother helped. Although the evidence did show some change of circumstances, as the court acknowledged, mother's petitions simply failed to demonstrate sufficiently changed circumstances.

Furthermore, mother was unable to demonstrate that a changed order was in A.O.'s or K.C.'s best interests. "[A] primary consideration in determining the child's best interest is the goal of assuring stability and continuity." (*Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) As to the best interests of the child, mother alleged that she had visited K.C. every day for the first two months of her life. Mother alleged, as to both A.O. and

17

K.C., that she had visited at "every possible opportunity," that she loved them and she believed that her bond with them was strong. Mother further alleged that it was through her children that "her family heritage lives" and that her children "will do best in her care as opposed to any other person." She then simply concluded that she has made the necessary changes in her life. Mother has clearly failed to show *how* it would be in her children's best interests to return them to her on family maintenance. Mother had already had over one year of services, yet failed to make substantive progress in her case plan. Moreover, her circumstances failed to assure the court of any stability or continuity. She was living in a sober living facility that would not allow her to have children live with her. Furthermore, mother had only had her current job for about one month. In view of the circumstances, it is difficult to see how reinstating mother's services, with the ultimate goal of returning A.O. and K.C. to her custody, would be in their best interests.

On the other hand, the evidence showed that it was in A.O.'s and K.C.'s best interests to be adopted. At the time of the hearing, A.O. had been living with her foster family for approximately nine months. She adjusted very quickly to their home, and she was "comfortable, secure and attached to her new family." The family was capable of meeting all her needs, and they loved her and were eager to adopt her. The social worker recommended that A.O. remain with them and the court proceed with the plan for them to adopt her.

As to K.C., the evidence showed that she had been living with the same family since her release from the hospital. She was approximately six months old at the time of

18

the hearing, and she had only ever lived with that family. K.C. was thriving in their home. She was clearly bonded with them and was easily soothed by them. They had demonstrated their ability to meet K.C.'s emotional, developmental, physical, and medical needs, and they were committed to providing her with a permanent home.

We conclude that the juvenile court properly evaluated the evidence and, placing special weight on the need for stability as was appropriate at that stage of the proceedings, determined that mother had not carried her burden of proof. The court properly denied mother's section 388 petitions.

## II. The Beneficial Parental Relationship Exception Did Not Apply

Mother contends that the court erred in not applying the beneficial parental relationship exception under section 366.26, subdivision (c)(1)(B)(i). We disagree.

At a section 366.26 hearing, the court determines a permanent plan of care for a dependent child. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50.) Adoption is the permanent plan preferred by the Legislature. (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) If the court finds that a child may not be returned to his or her parents and is likely to be adopted, it must select adoption as the permanent plan, unless it finds a compelling reason for determining that termination of parental rights would be detrimental to the child under one of the exceptions set forth in section 366.26, subdivision (c)(1)(B). One such exception is the beneficial parental relationship exception set forth in section 366. 26, subdivision (c)(1)(B)(i). (See *In re Jerome D*. (2000) 84 Cal.App.4th 1200, 1206.) This exception applies when the parents "have maintained regular visitation and contact

with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The phrase "benefit from continuing the relationship" refers to a parent/child relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 575 (*Autumn H*).) It is the parent's burden to show that the beneficial parental relationship exception applies. (*In re Lorenzo C*. (1997) 54 Cal.App.4th 1330, 1345.)

In support of her position, mother asserts that she visited with K.C. consistently. Specifically, when K.C. was in the hospital, she visited every day and provided breast milk. As to A.O., mother asserts that she visited regularly for most of the dependency, and that the visits "went well and were always appropriate." The main evidence she points to her own testimony that, although A.O. might be upset when she got to a visit, she would calm down after seeing mother. She also points to her testimony that, at one visit A.O. said "no" when it was time to leave, and she reached for mother and started crying. Another time, when mother corrected A.O., A.O. started to cry; however, mother

20

comforted her, and A.O. hugged her for a long time. Mother also asserts that A.O. would copy every word she said.

We first note that mother did not maintain regular visits with A.O. Mother failed to visit with A.O. at all from approximately June 13, 2012 to September 2012, and then again from September 28, 2012 to January 30, 2012. Moreover, mother's interactions with A.O., as well as with K.C., do not even begin to demonstrate that her relationship with them promoted their well-being "to such a degree as to outweigh the well-being [they] would gain in a permanent home with new, adoptive parents." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Mother has not proffered any evidence to support a finding that A.O. or K.C. had a "substantial, positive emotional attachment [with her] such that [either child] would be greatly harmed" if the relationship was severed. (*Ibid.*) To the contrary, the record shows that A.O. had a difficult time with visits. In contrast to mother's description of their visits, the social worker reported that A.O. would say that she did not want to go to the visits and that she would cry during them. At the end of the visits, A.O. had no trauma leaving mother, and she would go right to the prospective adoptive mother. The social worker opined that A.O. had a stronger bond with the prospective adoptive parents than with mother, and she recognized them as "mommy" and "daddy." A.O. did not call mother "mommy." Regarding K.C., who was less than one year old, she had never lived with mother. Mother had only had visits with K.C., and the social worker opined that the time she spent with K.C. would not have established a bond. In light of all this evidence, it is difficult to conclude that A.O. or K.C. had such a

21

positive, emotional, or beneficial relationship with mother that either of them would be greatly harmed if mother's parental rights were terminated. (*Autumn H*., *supra*, 27 Cal.App.4th at p. 575.)

We further note that A.O. and K.C. were thriving in their prospective adoptive homes. They were both attached to their prospective adoptive parents. The prospective adoptive parents were willing, able, and eager to meet the needs of A.O. and K.C. on a permanent basis.

We conclude that the beneficial parental relationship exception under section 366.26, subdivision (c)(1)(B)(1), did not apply here.

DISPOSITION

The court's orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

McKINSTER
J.

MILLER
J.